# IN THE UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF TENNESSEE
# NASHVILLE DIVISION

| | |
|---|---|
| BETTY FOX, | ) |
| | ) |
|     Plaintiff, | )   No. 3:14-cv-02276 |
| | )   Judge Trauger |
| v. | )   Magistrate Judge Frensley |
| | ) |
| YATES SERVICES, LLC, | ) |
| | )   JURY DEMAND |
|     Defendant. | ) |

## MEMORANDUM

Before the Court is Defendant Yates Services, LLC's Motion for Summary Judgment. (Docket No. 17.) For the reasons stated herein, Defendant's Motion will be granted.

## I. BACKGROUND

### A. Factual

Betty Fox ("Fox") was hired by Yates Services, LLC ("Yates") on December 27, 2011 as an at-will contract employee. (Docket No. 21, ¶¶ 2, 3.) Yates is a Nissan contractor that, among other things, staffs contract employees for Nissan as needed. (*Id.* at ¶ 1.) The same day she was hired, Fox received Yates' Anti-Harassment Policy, Yates' Work Place Anti-Violence Policy, and Yates' employee handbook. (*Id.* at ¶¶ 4–6.) The Anti-Harassment Policy and Work Place Anti-Violence Policy "included procedures for employees to complain about harassment and/or potential violence or threats of violence, and provided that employees who violated the policies could be subject to discipline, and that employees who make false complaints of harassment or workplace violence could also be subject to discipline." (*Id.* at ¶ 5.) The employee handbook contained a harassment-free environment policy and "stated that the first year of an associate's

1

assignment at Nissan would be considered an introductory period and that, during months 7–12 of the first year, the next corrective step after receiving a written reminder was termination." (*Id.* at ¶¶ 6, 8.) It also included "a corrective action policy that allowed Yates to determine that an employee's conduct is serious enough to skip certain steps in progressive discipline and impose discipline that Yates determined to be appropriate." (*Id.* at ¶ 7.)

Fox began working on January 17, 2012 in the paint department, where she was responsible for looking for and correcting defects on the cars' painted bodies. (*Id.* at ¶¶ 9, 10.) Fox alleges that early in her employment, a Nissan employee and co-worker, Troy Baker, began sexually harassing her, and others harassed her because she is a Jehovah's Witness. According to the Statement of Undisputed Material Facts, Fox's allegations of harassment can be summarized as follows:

- "During her first week of working on the line, … she had a conversation with Little during which he asked Fox about being a Jehovah's Witness, which then led to a discussion about a house he had for sale." (*Id.* at ¶ 28.)
- "[I]n February 2012, … Baker made comments about [Fox's] make-up, that Baker asked her when she was going to shave her mustache, and that he made comments about Fox having 'drawn-on eyebrows.'" (*Id.* at ¶ 12.)
- "[E]arly in her employment, … Baker would look [Fox] up and down on occasion and sometimes, while not looking at her face, would say 'I got what you need.'" (*Id.* at ¶ 13.)
- "On two different occasions early in her employment, … Baker positioned himself in front of Fox in close proximity to his groin area with his leg up, and on both of those occasions, Fox moved Baker's leg or told him to move his leg and walked away." (*Id.* at 14.)
- "[E]arly during her employment, Fox claims she informed Baker that he had missed a defect on a car. After the third time Fox called him (the environment could be very loud), Baker responded by stopping the assembly line and coming over to Fox and yelling 'what?'" (*Id.* at ¶ 15.)
- "[O]ne day Baker pushed a car door that hit her in the back, but [Fox] admits this was a one-time occurrence and after Fox confronted Baker about it, he apologized." (*Id.* at ¶ 17.)

2

- "[E]mployees were staring at her and talking about her." (*Id.* at ¶ 21; *see* ¶¶ 40, 42, 46, 50.)
- "On one incident, before May 15, 2012, … Baker yelled at her about her religion as a Jehovah's Witness, and made comments about her having a fake Bible and that she needed a real one." (*Id.* at ¶ 31.)
- "Baker made comments about Fox's religion two or three times." (*Id.* at ¶ 32.)
- "On a couple of occasions, … Palmer would say to Fox in front of other employees things like "Where you going to church? You going to the Kingdom Hall? You going to a church?" (*Id.* at ¶ 33.)

At some point early in her employment (the parties do not specify exactly when), Fox went to her supervisor, Russell Rigsby, and told him about her incidents with Baker. (*Id.* at ¶ 19.) Rigsby then told his boss, Rodney Baggett, and then contacted Bill Little, Nissan's Human Resources Representative, asking him to investigate. (*Id.* at ¶ 20.) Whenever Fox brought an issue to Little's attention, "he performed an investigation by first discussing with Fox the details of her complaints, then contacted each employee Fox identified to get their side of the story, interviewed any other potential witnesses, and then went back and told Fox what he found." (*Id.* at ¶ 22.) On an unspecified date early in her employment, Fox told Little about Baker sexually harassing her, saying that he had followed her home and had made remarks to her. (*Id.* at ¶ 23.) Little interviewed the entire workgroup but could not find any corroboration that sexual harassment had occurred. (*Id.* at ¶ 24.) Fox also complained to Little about Baker and Palmer's comments about her religion, but Little's investigation did not reveal any wrongdoing. (*Id.* at ¶ 34.)

After conducting several investigations following Fox's complaints, Little asked her why she was the only one involved and was at the center of every investigation. (*Id.* at ¶ 35.) Little told her that "he could not find any evidence of what she was saying to be true" and on multiple

3

occasions, he, as well as Rigsby, warned her that her continued complaints were disruptive and could result in discipline. (*Id.* at ¶¶ 35–36.)

On May 15, 2012, approximately five months after starting work, Fox received a verbal warning "for comments that could have been reasonably understood as a threat, which grew out of an incident in which it was reported that Fox made a threat that she was going to shoot Baker with a gun." (*Id.* at ¶ 25.) Fox admits that she was given a verbal warning but disputes that the threats could have reasonably been understood as a threat and states that she was speaking with someone else and that Baker overheard. (*Id.*) Baker was given a "Written Reminder" on the same day "for disrupting the workforce as a result of his interactions with Fox." (*Id.* at ¶ 26.)

On August 6 through 7, 2012, Little and Rigsby "pulled each employee in Fox's workgroup off the line and reminded them individually of Nissan's code of conduct and harassment policies, talked to the employees about these policies, and informed them that harassment was a serious offense and would not be tolerated." (*Id.* at ¶ 37.) Three months later, on October 1, Fox was given a Written Reminder for approaching Baker in an inappropriate and confrontational manner that stated, in relevant part, that her actions "were unacceptable and counter-productive to the successful operation of this company" and that it was the company's responsibility to provide "a work environment free of harassment or intimidation of any kind." (*Id.* at ¶¶ 38–39.) It also warned her that, if she did not "correct the problem or continue to display this type of behavior in the future, further corrective action may be taken, up to and including termination." (*Id.* at ¶ 39.)

The next morning Fox came into work very upset, and she spoke to Rigsby "about incidents such as people staring at her, people not leaving her alone, that the work group did not like her, and that Eric Gokey (a Nissan employee) tried to push her and Palmer tried to break her

arm when he raised the hood on a car." (*Id.* at ¶ 40.) Little investigated her complaints but was unable to find evidence to support her claims of people staring or the incidents with Gokey and Palmer. (*Id.* at ¶ 43.) One Nissan employee witnessed the Palmer incident, and in his deposition he testified that Palmer was not being malicious and that Fox was not harmed. (*Id.* at ¶ 44.) Ultimately, "Little found that Fox's repeated complaints were causing disruption in the workgroup because everyone tried to avoid her and each time he did an investigation, employees complained about her." (*Id.* at ¶ 45.)

That same day, at Fox's request, Rigsby arranged for her to speak with the area manager, Rodney Baggett. (*Id.* at ¶ 41.) Fox told Baggett that she did not believe she should have received the written reminder. (*Id.*) After the meeting with Baggett, Fox met with the senior manager of paint production for Nissan, Tim Harwood, and told him that "her co-workers did not like her because she was married to a Caucasian and that she was anti-union." (*Id.* at ¶¶ 47, 49.) Harwood told her "that he thought there was a problem because it seemed like Fox was involved in a lot of workplace drama, that he needed the drama to stop, and wanted her to only have business-related conversations with co-workers." (*Id.* at ¶ 48.) After this meeting, Fox continued to complain to Rigsby about co-workers staring at her, talking about her, and trying to get her fired. (*Id.* at ¶ 50.) These were complaints she raised on "almost a weekly basis" toward the end of her employment. (*Id.* at ¶ 46.)

Fox's continued complaints disrupted Rigsby's work, so he called Baggett, who then told Little "that he had to do something about Fox because Rigsby could not take it anymore." (*Id.* at ¶ 52.) Little suspended Fox on October 3 so that Nissan could conduct another investigation. (*Id.* at ¶ 53.) As a result of this investigation, it was determined that Fox's complaints could not continue. (*Id.* at ¶ 54.) Little prepared an Executive Summary (the "Memorandum"), dated

October 16, which recited the items that led to the recommendation that Fox be fired. (*Id.* at ¶ 55.) The Memorandum reads, in part,

> Betty Foxx [sic] has less than one year of employment with Yates. Her issues have been escalating to the point that they are a serious disruption to the work group and a major consumption of management's and HR/ER's time (time that should be used in other vital areas of the business). She has a continuing pattern of inappropriate behavior. This has resulted in her reaching the Final Written Reminder Step in the corrective action process. According to Yates policy this would merit termination of employment. My recommendation is to terminate the employment of Betty Foxx [sic]. Nissan ER, Yates ER and Management agree with this recommendation.

(*Id.* at ¶ 56.) Yates fired Fox for disruptive behavior on or around October 19, 2012. (*Id.* at ¶ 57.)

In sum, Fox received a verbal warning for inappropriate conduct on May 15, 2012, "a written warning on October 1, 2012 for inappropriate conduct, and was suspended pending further investigation on October 3 before being ultimately terminated for disruptive behavior on October 19, 2012." (Docket No. 18, p. 21.)

### B. Procedural Posture

Fox filed her Complaint against Yates on November 19, 2014. (Docket No. 1.) The instant Motion for Summary Judgement along with a Memorandum in Support and a Statement of Undisputed Facts were filed by Yates on November 16, 2015. (Docket Nos. 17, 18, 19.) Fox filed her Response in Opposition on December 7, 2015 (Docket No. 20) and Yates filed its Reply on December 17 (Docket No. 22).

## II. LEGAL STANDARD

Summary judgment is rendered when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Where a

moving party without the burden of proof at trial seeks summary judgment, the movant "bears the initial burden of showing that there is no material issue in dispute." *Lindsay v. Yates*, 578 F.3d 407, 414 (6th Cir. 2009) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)). "Once a moving party has met its burden of production, 'its opponent must do more than simply show that there is some metaphysical doubt as to the material facts.'" *Blizzard v. Marion Tech. Coll.*, 698 F.3d 275, 282 (6th Cir. 2012) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)). The court must "draw all reasonable inferences in favor of the nonmoving party, and it may not make credibility determinations or weigh the evidence." *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 150 (2000). "Reviewing the facts in the light most favorable to the nonmoving party, the court must ultimately determine whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Blizzard*, 698 F.3d at 282 (internal citations and quotations omitted).

A movant with the burden of proof, however, must present evidence "sufficient for the court to hold that no reasonable trier of fact could find other than for the moving party." *Calderone v. U.S.*, 799 F.2d 254, 259 (6th Cir. 1986) (citation omitted). The movant "must show that the record contains evidence satisfying the burden of persuasion and that the evidence is so powerful that no reasonable jury would be free to disbelieve it." *Arnett v. Myers*, 281 F.3d 552, 561 (6th Cir. 2002) (citation omitted). Summary judgment in favor of the party with the burden of persuasion "is inappropriate when the evidence is susceptible of different interpretations or inferences by the trier of fact." *Hunt v. Cromartie*, 526 U.S. 541, 553 (1999).

### III. ANALYSIS

Fox brings the following claims against Yates under Title VII of the Civil Rights Act of 1964 ("Title VII"): (A) hostile work environment based on Fox's gender and religion ("Count I"); and (B) retaliation ("Count II").

**A. Hostile Work Environment**

Under Title VII, employers may not "discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 24 U.S.C. § 2000e-2(a)(1) (2012). The Supreme Court has held that a plaintiff may establish a Title VII violation by proving that discrimination based on sex or religion created a hostile or abusive work environment. *Meritor Savings Bank v. Vinson*, 477 U.S. 57, 66 (1986). A hostile work environment occurs "[w]hen the workplace is permeated with discriminatory intimidation, ridicule, and insult that is sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (internal quotations and citations omitted). The Sixth Circuit has stated that, for a plaintiff to hold an employer liable for a hostile work environment caused by a coworker, she must show that:

> (1) she was a member of a protected group, (2) she was subjected to unwelcome harassment, (3) the harassment was based upon the employee's protected status, such as race or gender, (4) the harassment affected a term, condition, or privilege of employment, and (5) the defendant knew or should have known about the harassing conduct but failed to take any corrective or preventative actions.

*Michael v. Caterpillar Fin. Servs. Corp.*, 496 F.3d 584, 600 (6th Cir. 2007) (quoting *Farmer v. Cleveland Pub. Power*, 295 F.3d 593, 605 (6th Cir. 2002)); *Mast v. IMCO Recycling of Ohio, Inc.*, 58 F. App'x 116, 119 (6th Cir. 2003).[1] Once the plaintiff has established a prima

---

[1] For Title VII hostile environment claims, "the elements and burden of proof are the same, regardless of the discrimination context in which the claim arises." *Crawford v. Medina Gen. Hosp.*, 96 F.3d 830, 834 (6th Cir. 1996)

8

facie case, the burden then shifts to the defendant to articulate a legitimate non-discriminatory reason for its actions. *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973). If the defendant proffers a legitimate reason for its actions, then the plaintiff must demonstrate, by a preponderance of the evidence, that the defendant's proffered reason is pretextual. *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 252–53 (1981) (citing *McDonnell Douglas*, 411 U.S. at 804; *Kline v. Tenn. Valley Auth.*, 128 F.3d 337, 342 (6th Cir. 1997)). The court must also consider whether the "constellation of surrounding circumstances, expectations, and relationships" formed a hostile or abusive workplace environment from both an objective and a subjective perspective. *Williams v. Gen. Motors Corp.*, 187 F.3d 553, 562 (6th Cir. 1999); *see Faragher v. City of Boca Raton*, 524 U.S. 775, 788 (1998).

In the present case, the first two factors are met because it is undisputed that Fox is a member of a protected class because of her sex and religion, 42 U.S.C. § 2000e-2(a)(1), and that she was subjected to unwelcome harassment. Yates contends that Fox has not presented evidence of the remaining three requisite elements. Fox argues that she has established a prima facie case of hostile work environment based on sexual and religious harassment. Assuming *arguendo* that Fox can establish the first four elements of a hostile work environment claim, she cannot establish the fifth element; therefore summary judgment in Yates' favor is appropriate.

The fifth element requires Fox to prove that Yates' response to her charges of harassment was negligent. *Fenton v. HiSAN, Inc.*, 174 F.3d 827, 829 (6th Cir. 1999). Under the test enumerated by the Sixth Circuit in *Blankenship*, a company may be held liable for coworker harassment if its "response manifests indifference or unreasonableness in light of the facts the employer knew or should have known." *Blankenship v. Parke Care Centers, Inc.*, 123 F.3d 868,

---

(citing *Risinger v. Ohio Bureau of Workers' Comp.*, 883 F.2d 475, 485 (6th Cir. 1989)). The court will therefore analyze the claims of discrimination based on sex and religion in tandem.

873 (6th Cir. 1997). Stated another way, "an employer's liability in instances of coworker harassment is based on its response to the reported sexual [or religious] harassment: an employer is liable if it does not respond in a 'reasonable' manner." *Mullins v. Goodyear Tire & Rubber Co.*, 291 F. App'x 744, 747 (6th Cir. 2008) (citing *Fenton*, 174 F.3d at 829–30).

"However, once an employer responds in good faith to charges of harassment with remedial measures, negligence in how the employer fashions the remedy is not enough to make the employer liable." *Martin v. Boeing-Oak Ridge Co.*, 244 F. Supp. 2d 863, 874 (E.D. Tenn. 2002) (citing *Blakenship*, 123 F.3d at 873). An employer may avoid liability if its remedial action is reasonably calculated to stop the harassment. *Spells v. Cuyahoga Comm. College*, 889 F. Supp. 1023, 1027–28 (N.D. Ohio 1994), *aff'd.* 51 F.3d 273, 1995 WL 124306 (6th Cir. Mar. 22, 1995). When an employer implements remedial measures, it can be liable for co-worker harassment only if the remedy "exhibits such indifference as to indicate an attitude of permissiveness that amounts to discrimination." *Blakenship*, 123 F.3d at 873. "Summary judgment is appropriate if the employer's response does not raise a genuine issue of whether the response was appropriate." *Spells*, 889 F. Supp. at 1028.

As a threshold matter, Yates took measures to prevent harassment and discrimination in its workplace by distributing the Anti-Harassment Policy and Work Place Anti-Violence Policy to all employees, as well as an employee handbook that reiterated those policies. The Supreme Court has stated that

> [w]hile proof that an employer had promulgated an anti-harassment policy with complaint procedure is not necessary in every instance as a matter of law, the need for a stated policy suitable to the employment circumstances may appropriately be addressed in any case when litigating the first element of the defense.

*Faragher*, 524 U.S. at 807. The Sixth Circuit elaborated that giving employees written notice of such policies and how they are enforced constitutes an adequate general preventive measure. *See Leugers v. Pinkerton Security & Investigative Servs.*, 205 F.3d 1340, 2000 WL 191685, at *3 (6th Cir. Feb. 3, 2000)[2]; *accord Roelen v. Akron Beacon Journal*, 199 F. Supp. 2d 685, 693–94 (N.D. Ohio 2002).

In terms of corrective action, "[t]he most significant immediate measure an employer can take in response to a sexual harassment complaint is to launch a prompt investigation to determine whether the complaint is justified." *Collette v. Stein-Mart, Inc.*, 126 F. App'x 678, 686 (6th Cir. 2005) (quoting *Swenson v. Potter*, 271 F.3d 1184, 1193 (9th Cir. 2001). "By doing so, 'the employer puts all employees on notice that it takes such allegations seriously and will not tolerate harassment in the workplace.'" *Id.* (quoting *Swanson*, 271 F.3d at 1193).

It is undisputed that an investigation was promptly launched every time Fox complained to her supervisors. *See Martin*, 244 F. Supp. 2d at 875. Each time Fox raised a complaint, Little conducted an investigation and, when appropriate, took disciplinary action. For example, in accordance with Yates' policies and procedures, Little investigated Fox's sexual harassment claims by interviewing her entire workgroup, including Baker. (*Id.* at ¶ 24.) Yates asserts, and Fox admits, that Little could not find any corroboration that sexual harassment occurred. (*Id.* at ¶ 24.) Yet Baker was still given a "Written Reminder" for disrupting the workforce as a result of his interactions with Fox. (*Id.* at ¶ 26.) Fox admits that, despite numerous investigations, Little

---

[2] The Sixth Circuit's decision in *Leugers* was unpublished and therefore not binding precedent. "It bears noting, then, that other Circuits also treat the existence of an anti-harassment policy (with complaint procedures) as *strong* evidence that the employer took sufficient general measures to prevent harassment." *Collette v. Stein-Mart, Inc.*, 126 F. App'x 678, 686 (6th Cir. 2005); *see An v. Regents of Univ. of Calif.*, 94 F. App'x 667, 674 (10th Cir. 2004) ("the sexual harassment policy and its dissemination generally evidence appropriate efforts to prevent sexual harassment"); *Caridad v. Metro-North Commuter R.R.*, 191 F.3d 283, 295 (2d Cir. 1999) ("not necessarily dispositive" but "an important consideration"), *cert. denied sub nom. Metro-North Commuter R.R. v. Norris*, 529 U.S. 1107 (2000); *Gawley v. Indiana Univ.*, 276 F.3d 301, 312 (7th Cir. 2001) ("In the face of this evidence that the university had a procedure in place to handle harassment, Gawley has no evidence that the university failed to exercise reasonable care in preventing … the harassing behavior").

was unable to find corroborating evidence to support her claims of sexual and religious harassment. (Docket No. 21, ¶¶ 24, 34.) Moreover, in early August 2012, "Little and Rigsby pulled each employee in Fox's workgroup off the line individually and reminded them of Nissan's code of conduct and harassment policies, talked to the employees about these policies, and informed them that harassment was a serious offense and would not be tolerated." (Docket No. 21, ¶ 37.) This type of response reflects neither indifference nor unreasonableness. Indeed, Fox admits that the sexual harassment she endured occurred early in her employment, indicating that Yates' response was effective. (*Id.* at ¶ 11.)

Nevertheless, Fox takes issue with Yates' actions because she contends that Yates was aware that Baker's other co-workers complained about him, (Docket No. 20-2, 13:8–15), that he was a "problem employee" (Docket No. 20, p. 9), and that "the extent of its 'corrective action' was to ask the members of the work group if they had seen or heard anything." Fox asserts that, if Yates had "truly wanted to prevent disruptions in the workplace, it would have seen to it that Ms. Fox did not have to deal with Mr. Baker or Mr. Palmer anymore." (*Id.* at pp. 12–13.) Yet the issue is not whether Yates' response was satisfactory to Fox or whether there were more effective measures Yates could have taken. The issue is whether Yates' response was appropriate at the time. *See Anderson*, 75 F. Supp. 2d at 796; *Blakenship*, 123 F.3d at 873–74. The court finds that it was.

The standard is whether Yates was indifferent or unreasonable in responding to the facts it knew or should have known. For all the reasons set forth herein, the court finds that Fox has failed to set forth sufficient evidence showing that a genuine issue for trial remains as to whether Yates' response to her claims of harassment were appropriate. Therefore, Yates is entitled to summary judgment as a matter of law on Count One of Fox's Complaint.

## B. Retaliation

Count Two of Fox's Complaint alleges that she was suspended with pay and then fired in retaliation for reporting sexual harassment to her supervisors. (Docket No. 1, ¶¶ 64–67.) Yates contends that there is no causal connection between Fox's complaints and her termination and that Fox cannot show that Yates' reasons for firing her were a pretext for retaliation. (Docket No. 22, p. 3.)

To support a prima facie case of retaliation, a plaintiff must show that "(1) [s]he engaged in activity protected by Title VII; (2) the exercise of [her] civil rights was known to the defendant; (3) thereafter, the defendant took employment action adverse to the plaintiff; and (4) there was a causal connection between the protected activity and the adverse employment action." *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir. 2000). It is undisputed that Fox has sufficiently met the first three elements. However, Yates argues that Fox cannot establish a causal connection between her sexual harassment complaints and her subsequent termination. Yates further argues that, even if Fox pled a prima facie case of retaliation, it had a legitimate, non-discriminatory reason for terminating her. Fox responds that she was terminated because Yates did not want to field her complaints about sexual and religious harassment. The court will address each of these arguments in turn.

With respect to the fourth element regarding causal connection, the Sixth Circuit explained in *Nguyen* that

> [t]o establish the causal connection required in the fourth prong, a plaintiff must produce sufficient evidence from which an inference could be drawn that adverse action would not have been taken had the plaintiff not filed a discrimination action. Although no one factor is dispositive in establishing a causal connection, evidence that defendant treated plaintiff differently from similarly situated employees or that the adverse action was taken shortly after plaintiff's exercise of protected rights is relevant to causation. The

> burden of establishing a prima facie case in a retaliation action is not onerous, but one easily met.

*Id.* (internal citations omitted). "[T]he burden is minimal, requiring the plaintiff to put forth some evidence to deduce a causal connection between the retaliatory action and the protected activity and requiring the court to draw reasonable inferences from that evidence, providing it is credible." *EEOC v. Avery Dennison Corp.*, 104 F.3d 858, 861 (6th Cir. 1997).

Fox alleges that Yates terminated her for complaining about sexual and religious harassment. Yates contends it fired Fox for her "disruptive and inappropriate behavior" and that Fox's complaints of sexual harassment were unrelated to her termination. (Docket No. 22, p. 4.) "A plaintiff does not need to show that the behavior complained of was in fact sexual harassment, only that she had a good faith belief that it was when she engaged in the protected activity." *Gliatta v. Tectum, Inc.*, 211 F. Supp. 2d 992, 1003 (S.D. Ohio 2002) (citing *Forman v. Small*, 271 F.3d 285 (D.C. Cir. 2001). Drawing all reasonable inferences in favor of Fox, the court finds that she has put forth sufficient evidence to satisfy the minimal burden. The next question is whether Yates has sufficiently established a legitimate, non-discriminatory reason for terminating her. *Fuhr v. Hazel Park School Dist.*, 710 F.3d 668, 674 (6th Cir. 2013), *abrogated on other grounds by Univ. of Tex. Sw. Med. Ctr. v. Nassar*, 133 S. Ct. 2517 (2013).

As with sex discrimination claims, once a plaintiff establishes a prima facie case of retaliation, the burden shifts to the employer to "articulate some legitimate, non-discriminatory reason" for the adverse employment decision. *Wheat v. Fifth Third Bank*, 785 F.3d 230, 237 (6th Cir. 2015). If the employer provides such a reason, the burden shifts back to the plaintiff to show that "the legitimate reasons offered by the employer were not its true reasons, but rather were pretext[.]" *Ondricko v. MGM Grand Detroit, LLC*, 689 F.3d 642, 653 (6th Cir. 2012). To establish pretext, a plaintiff can show that the employer's proffered reasons (1) have no basis in

fact; (2) did not actually motivate the adverse action; or (3) were insufficient to explain the adverse action. *Loyd v. St. Joseph Mercy Oakland*, 766 F.3d 580, 590 (6th Cir. 2014) (citing *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 576 (6th Cir. 2003) (en banc)). A plaintiff must produce "sufficient evidence from which the jury could reasonably reject [the employer's] explanation and infer that … the employer did not honestly believe in the proffered non-discriminatory reason for its adverse employment action." *Braithwaite v. Timken Co.*, 258 F.3d 488, 493–94 (6th Cir. 2001) (citations and internal quotations marks omitted). "In keeping with the burden required at the summary judgment stage, a plaintiff 'need only identify genuine disputes of material fact regarding the legitimacy of the defendant's stated reasons.'" *Kirkland v. James*, 657 F. App'x 580, 586 (6th Cir. 2016) (quoting *Wheat*, 785 F.3d at 240).

According to Yates, Fox was terminated for disruptive behavior unrelated to her original sexual harassment complaint after she reached the final stage of corrective action. (Docket No. 22, p. 5.) It is undisputed that Fox was given a verbal reminder on May 12, 2012. (Docket No. 21, ¶ 25.) Yates asserts that Fox "made a threat that she was going to shoot Baker with a gun." (*Id.*) Fox does not deny making the statement, but she denies that it "could have reasonably been understood as a threat" because Baker overheard her talking to a coworker. (*Id.*) On October 1, 2012, she received a Written Reminder for approaching Baker in an "inappropriate and confrontational manner." (*Id.* at ¶ 38.) The Written Reminder stated in part that Fox's actions were unacceptable and that, if she did not "correct the problem or continue[d] to display this type of behavior in the future, further corrective action may be taken, up to and including termination." (*Id.* at ¶ 39.) Fox continued complaining of people not liking her and staring at her and this caused Rigsby to alert Little that it disrupted Rigsby's workgroup and he could not take it anymore. (Docket No. 18, p. 22.) On October 3, Fox was suspended so that another

15

investigation could be conducted. (*Id.*) Following the investigation, Yates determined that Fox's continued disruptions were excessive and decided to terminate her on or around October 19, "stating in a memorandum documenting her termination that Fox's issues 'have been escalating to the point that they are a serious disruption to the work group and a major consumption of management and HR/ER's time" and a pattern of "inappropriate behavior." (*Id.* at p. 23.) The undisputed material facts show that Yates followed its corrective action policy in disciplining Fox. It is further undisputed that Fox's assignment at Nissan was considered an "introductory period," meaning that during months 7–12 of her first year, the next step of corrective action following a Written Reminder was termination. (Docket No. 21, ¶ 8.) Therefore, the court finds that Yates has proffered a legitimate, non-retaliatory reason for terminating Fox (and followed its own procedures).

The burden now shifts to Fox to show that there is a genuine dispute of material fact regarding the validity of Yates' stated reasons. First, Fox attempts to rebut Yates' legitimate, non-retaliatory reason for termination and demonstrate pretext by arguing that the proffered reason has no "basis in reality." (Docket No. 20, p. 12.) This type of rebuttal "consists of evidence that the proffered bases for the plaintiff's discharge never happened, *i.e.*, that they are 'factually false.'" *Manzer v. Diamond Shamrock Chem. Co.*, 29 F.3d 1078 (6th Cir. 1994). The only evidence she offers to bolster this claim is that "Mr. Little could not deny that he found evidence to substantiate her claims during his investigation." (*Id.* at p. 13.) However, Fox herself admits that Little could not find any evidence to substantiate her complaints of sexual and religious harassment. (Docket 21, ¶¶ 24, 34–35.) She also admits that her repeated complaints

were disruptive. (*Id.* at ¶ 51.) Thus, Fox has failed to demonstrate that Yates' proffered bases for her discharge are factually false.[3]

The court finds that Yates articulated a legitimate, non-discriminatory justification for firing Fox, and Fox has not demonstrated a genuine dispute of material fact over whether Yates' proffered reason for terminating her was a pretext. Therefore, Yates is entitled to summary judgment on the retaliation claim as a matter of law.

IV. CONCLUSION

For the reasons stated above, Defendant's Motion for Summary Judgment (Doc. No. 17) will be **GRANTED** and an appropriate Order will be filed herewith.

_____
ALETA A. TRAUGER
UNITED STATES DISTRICT JUDGE

---

[3] Fox's contention that Yates' "state of mind" is a genuine issue of material fact because "Mr. Little could not deny that he found evidence to substantiate her claims during his investigation" (Docket No. 20, p. 13), fails for the same reason.